DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@holdenlegal.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@holdenlegal.com
HOLDEN KIDWELL HAHN & CRAPO, P.L.L.C.
P.O. Box 50130
1000 Riverwalk Drive, Suite 200
Idaho Falls, ID 83405
Telephone: (208) 523-0620
Facsimile: (208) 523-9518

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN D. FARISH, III,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>BECHTEL MARINE PROPULSION<br>CORPORATION, a Delaware corporation,<br><br>　　　　　　　　Defendant. | Case No. 4:16-cv-00268<br><br>**COMPLAINT AND DEMAND FOR<br>JURY TRIAL**<br><br>Filing Fee:　　$400.00 |

Plaintiff, John D. Farish, III, by and through his counsel of record Holden, Kidwell, Hahn & Crapo, P.L.L.C. and as a cause of action against Defendant Bechtel Marine Propulsion Corporation, alleges and complains as follows:

**JURISDICTION AND VENUE**

1.　This is an action brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*; 42 U.S.C. § 1981a, *et seq.*; and the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*

1-　COMPLAINT AND DEMAND FOR JURY TRIAL

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1332, 1343, and 1367; and 42 U.S.C. § 2000e.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 1332, 1343, and 1367; and 42 U.S.C. § 2000e.

3. Venue in this action properly lies in the United States District Court for the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose, in this judicial district; and venue also properly lies in this district pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices were committed in this judicial district.

## PARTIES

4. Plaintiff John D. Farish, III ("Farish"), is a male citizen and resident of the United States of America, who resides in Blackfoot, Idaho.

5. Defendant Bechtel Marine Propulsion Corporation ("BMPC") is a Delaware corporation that operates its business in Butte County, Idaho.

6. At all times material to this Complaint, BMPC regularly employed fifteen or more persons, and was engaged in an industry affecting commerce, bringing Defendant within the ambit of Idaho Code §§ 18-7301 and 67-5901, *et seq.*; 42 U.S.C. § 2000e, *et seq.*; and 42 U.S.C. § 12111.

## FACTS COMMON TO ALL COUNTS

7. Farish realleges and incorporates by reference paragraphs 1 through 6 above, as though fully incorporated herein.

8. BMPC is contractor for the United States Department of Defense ("DoD") and the United State Department of Energy ("DOE") and is responsible for running a portion of the Idaho National Laboratory ("INL").

9. Farish was hired by BMPC's predecessor at the INL on or about November 25, 1985, to work as a drumworker rigger at the INL.

10. After BMPC won the DoD/DOE contract at the INL, Farish remained in the same position.

11. In or around July 2013, one of Farish's co-workers, Mike Storer ("Storer"), began targeting Farish and another co-worker, Jody Youngstrom ("Youngstrom") with rude, harassing, and violent behavior.

12. For instance, Storer, who is significantly larger than Farish, would "belly bump" Farish and slap Farish's buttocks extremely hard.

13. In one such instance, when they were entering the locker room, Storer belly bumped Farish, nearly knocking him over, and then slapped Farish exceedingly hard on Farish's inner thigh. As Storer later went to sit down in one of the chairs in the locker room, Farish slightly wiggled the chair. Storer erupted in a rage, intimidatingly stood nose to nose with Farish, and began screaming profanities and yelling that Farish had hurt Storer's back.

14. After this incident, Storer escalated his aggressive conduct toward Farish. In addition to belly bumping Farish and slapping Farish's buttocks, Storer began slamming the door of the locker room into Farish's locker and would bump Farish's shoulder whenever he walked by. Storer took several opportunities to physically intimidate and threaten Farish.

15. During this time, Storer also began to escalate his inappropriate behavior toward Youngstrom. For instance, Storer would regularly burp and/or fart on Youngstrom's food at lunch. Storer refused to cease his harassment, even after Youngstrom asked Storer to stop.

16. BMPC's management was aware of, and frequently witnessed, Storer's behavior. Rather than take any corrective action, BMPC's management—Randy Middleton ("Middleton") in particular—just laughed at Storer's harassment of Farish and Youngstrom.

17. One day, Farish needed to use the hyster (a pallet truck used by the laborers). After searching all over for the hyster, Farish asked Storer where it was stored, since Farish had seen Storer

using the hyster earlier that day. Storer angrily responded with profanity and told Farish that if he wanted to use the hyster, he should have been at that day's briefing.

18. Farish had been excused from the briefing by management. Farish reiterated he just needed to know where the hyster was. After some stalling, Storer eventually told Farish that Storer had taken the hyster to the mechanic.

19. Unbeknownst to Farish, Storer reported their interaction regarding the hyster to Middleton, saying that Farish had acted inappropriately and had hurt Storer's feelings.

20. Farish subsequently calmly approached Storer, asking him why Storer was treating him this way and why he was making statements to Middleton that were not factually accurate.

21. Storer flew into a fit of rage, threw a 38-pound box at Farish (which narrowly missed hitting Farish's feet), got within a few inches of Farish's face and began yelling assorted profanities before eventually walking off.

22. On another occasion, when Storer and a few of his co-workers informed Farish they were bored and had nothing to do, Farish mentioned that they could help him. Storer suddenly snapped, began swearing at Farish, and came within a few inches of his face yelling.

23. Farish asked Storer to stop and he eventually backed away. However, again, unbeknownst to Farish, Storer reported to Middleton that Farish had acted inappropriately and hurt Storer's feelings.

24. Storer continued to harass Farish and create a hostile work environment. Once, when Youngstrom, who is very religious and conservative, returned from a trip with his family to visit his twin 18-year-old daughters in Boise, and had stayed in his daughters' apartment, Storer asked very loudly and in front of everyone in the lunch room, "Jody, how can you sleep in your daughters' apartment with them bringing their boyfriends home and f**king

them all night?" which Storer followed with sounds mimicking creaking bed springs and moaning.

25. Youngstrom was very upset by Storer's behavior and comments, and stood up from his chair, red-faced. Despite Youngstrom's obvious anger at this comment, Storer just laughed and refused to apologize.

26. Farish reported the situation to Middleton, asking him to speak with Storer about his inappropriate behavior. Middleton did nothing.

27. Storer made the same comments approximately one week later, again asking Youngstrom how he could sleep in his daughters' apartment with them bringing their boyfriends home and "f**cking them all night," and making creaking and moaning noises. When Youngstrom objected to the comments, Storer just laughed very loudly and said, "Oh, come on grandpa!"

28. Farish subsequently approached Storer regarding his comments about Youngstrom's daughters. Storer first pretended not to know what Farish was talking about. Then Farish explained that Storer had sexually harassed Youngstrom and that, given his comments, as well as Storer's history in the workplace, he could potentially be fired for his actions.

29. Storer began swearing, then walked over to Youngstrom and said, "John says I was sexually harassing you." Youngstrom responded, "Yes, you did." Storer then stated, "I don't remember it." Youngstrom responded, "You've done it twice and you've never apologized." Storer then said, "I don't remember it, but if it happened, I'm sorry."

30. Farish subsequently has a conversation with Middleton, again reporting his concerns about Storer's inappropriate and sexually harassing behavior and comments. Middleton stated, "That's not what Mike [Storer] says" and walked away, not wanting to hear anything more about what had occurred or address the situation.

5- COMPLAINT AND DEMAND FOR JURY TRIAL

31. In addition to Storer's inappropriate behavior, Farish witnessed and later reported harassment by other employees. For example, Josh Fulmer ("Fulmer"), the son of one of BMPC's Human Resources ("HR") employees, pulled down the pants of Stacy F, a 22-year-old female co-worker of Fulmer, in front of many other male employees.

32. A new employee, Ryan Esplan ("Esplan"), stood up for Stacy Foster ("Foster") and told the men that Stacy F was married, was somebody's daughter, and that their actions were unacceptable. One man in the crowd yelled at Esplan, saying, "You f**king prude, shut up!"

33. After Farish reported this incident, Fulmer told Foster that they needed to make up a story about what happened. Foster refused. Nevertheless, HR accepted Fulmer's fabricated version of events—that he accidentally caught Foster's belt loop—despite its impossibility, since Foster was wearing company-issued scrubs at the time of the incident, which have no belt loops.

34. By August 2013, Farish had decided to officially report the hostile work environment to HR since Middleton was apparently going to do nothing about it. Farish filed an 8-page-long complaint detailing sexual harassment, physical assaults, and other inappropriate activities, including the above-listed incidents.

35. At first, it appeared that HR was going to take Farish's report seriously and address the hostile work environment.

36. However, in late November 2013, HR held a meeting with Farish. HR thanked Farish for his report, but was dismissive of its contents. In fact, at that meeting, HR issued Farish two written disciplinary actions: one for wiggling Storer's chair after being assaulted in the locker room and a second for telling a dirty joke which Farish had never even heard before, let alone told.

37. The retaliation from Farish's co-workers and managers also intensified after he reported the hostile work environment to HR.  Frequently, Farish's co-workers would refuse to talk or work with him, except to say "F**k you, Farish," and would bump Farish's shoulder whenever they walked past.  Farish also had a co-worker spit a wad of snot on the floor where Farish was walking.

38. HR also continued to fabricate reasons to discipline Farish.  For instance, after Farish had a disagreement with Craig Hanson ("Hanson"), a co-worker, about how to perform a certain procedure—at the end of which, both Hanson and Farish chuckled and joked, calling each other "hard headed old coots"—HR put another disciplinary letter in Farish's employment file.

39. HR began calling Farish's co-workers into the HR office for no reason other than to ask them questions about Farish and whether they could provide information about things Farish may have done wrong at work.

40. At one point, two HR employees, Dan Miller and Kent Esplin, interviewed Farish about whether he had been involved in a fight at the INL in the 1980s because "someone" had told them Farish "may" have gotten in a fight at work back then.  Farish truthfully told the HR employees that he had never been in a fight at work.

41. As part of its investigation into Farish's report, HR tried to convince Youngstrom to state that Storer had apologized for his offensive statements and that the incident was completely resolved.  Youngstrom refused.

42. In April 2014, HR informed Farish that it had concluded its investigation of Farish's complaint.  While concluding that Farish's complaints had merit, HR also determined that Farish also would be disciplined.

43. About a week later, Farish was again called in to HR for a meeting with Dr. Curtis (the INL's occupational medicine physician), HR representative Dan Miller ("Miller"), and Farish's union representative. Dr. Curtis told Farish that, as a result of two investigations, they had determined that Farish's behavior was "consistent with workplace violence." As a result of this unfounded conclusion, Farish was required to meet with Dan Weinrich ("Weinrich"), the Employee Assistance Program ("EAP") psychologist.

44. Farish complied with this requirement and, together with his union representative, met with Weinrich. Farish filled out the initial paperwork and had a 30-minute-long interview with Weinrich.

45. Weinrich also had Farish take a long computer-based test. Farish asked whether he should answer the questions based on how Farish felt that day or when Storer was harassing Farish. Weinrich told Farish to answer based on how Farish felt at the time he was taking the test. Therefore, Farish answered questions such as "I feel angry" with "false," because he did not feel angry at the time he was taking the test.

46. After the computer-based test, Weinrich stopped Farish as he was getting ready to leave, accusing Farish of being untruthful on the test, since (for instance) Farish must have been angry when the incidents with Storer were happening. Farish agreed, but told Weinrich that he had answered according to Weinrich's instructions, and that he was not angry at that time.

47. At or about the end of July 2014, Farish was again called in to HR. Farish was met by Dr. Curtis, Miller, Debra Motteshard, Stan Washburn (Farish's upper-level supervisor), and Farish's union representative.

48. Farish was informed that Weinrich told them Farish was not being honest. Despite Farish's explanation, they informed Farish that they could not risk having a shooting, "like the Navy

yard shooting" at the INL. Farish was immediately placed on administrative leave, with pay, and humiliatingly escorted off the premises by an armed security guard.

49. Despite repeatedly contacting BMPC for an update, Farish heard nothing for two months.

50. Eventually, BMPC told Farish that he would have to meet with John Christensen ("Christensen"), a counselor in Idaho Falls.

51. Farish met with Christensen together with his union representative. Christensen interviewed Farish, asking more detailed questions than Weinrich had, and, at the end of the session, said he would have Farish back to work by Wednesday of the next week.

52. However, weeks passed, and Farish again heard nothing from BMPC.

53. In mid-September 2014, BMPC communicated to Farish that he would have to attend counseling sessions with Dr. Whitley, yet another counselor, and that Farish would have to pay for these sessions himself.

54. Farish met with Dr. Whitley from the beginning of October 2014 through December 12, 2014, and paid for these sessions himself.

55. Dr. Whitley contacted BMPC, informing them that he had no concern about allowing Farish to return to work.

56. However, BMPC has, to date, taken no action on either Christensen or Dr. Whitley's recommendations. Instead, BMPC has left Farish on paid administrative leave for more than a year and a half, with no end in sight.

57. Farish's ability to work at the INL has been destroyed as a result of the false allegations and actions taken by BMPC.

58. On March 17, 2015, Farish filed a charge of discrimination against BMPC with the Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Idaho Human Rights Commission.

59. Farish received his Notice of Right to Sue letter on or about March 29, 2016. A true and correct copy of such Notice of Right to Sue letter is attached hereto as Exhibit A. Farish has exhausted his administrative remedies against BMPC.

## COUNT ONE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
**(Discrimination Based Upon Perceived Disability)**

60. Farish realleges and incorporates by reference paragraphs 1 through 59 as though fully set forth herein.

61. BMPC perceived and regarded Farish as being disabled, treating Farish as if he suffers from a psychological disorder.

62. The perceived disability is not transitory or minor. The perceived disability exceeds six months in duration.

63. Farish was subjected to adverse employment actions by BMPC when he was placed on paid administrative leave, forced to undergo numerous psychological assessments, denied job training and opportunities, and required to pay for unnecessary treatment himself.

64. Farish was qualified for his job as a laborer, and was able to perform the essential functions of his job.

65. BMPC took adverse employment action against Farish as a result of BMPC regarding Farish as being disabled.

66. As a direct and proximate result of BMPC's actions and/or failures to act, Farish has suffered and will continue to suffer a loss of earnings and other employment benefits and job

opportunities, including loss of overtime pay. Farish is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him.

67. BMPC's conduct was malicious and oppressive, and done with reckless disregard for Farish's federally protected rights, for which Farish is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## COUNT TWO
## VIOLATION OF THE IDAHO HUMAN RIGHTS ACT
### (Discrimination Based upon Perceived Disability)

68. Farish realleges and incorporates by reference paragraphs, through 1 through 67 as though fully set forth herein.

69. BMPC violated the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq.*, by discriminating against Farish due to BMPC's regarding Farish as disabled.

70. As direct and a proximate result of BMPC's actions and/or failure to act, Farish has suffered and will continue to suffer a loss of earning and other employment benefits and job opportunities, including loss of overtime pay. Farish is therefore entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him.

71. BMPC's conduct was malicious and oppressive, and done with reckless disregard for Farish's rights, for which Farish is entitled to punitive damages pursuant to Idaho Code § 67-5908.

## COUNT THREE
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### (Hostile Work Environment)

72. Farish realleges and incorporates by reference paragraphs 1 through 71 as though fully set forth herein.

73. Farish was subjected to sexual comments and sexual harassment, slurs, insults, stares, intimidation, jokes, and other verbal comments and gestures from other BMPC employees.

74. Farish did not welcome the conduct.

75. The conduct was sufficiently severe or pervasive to alter the conditions of Farish's employment and create an abusive or hostile work environment.

76. Farish perceived the working environment to be abusive and hostile.

77. A reasonable person in Farish's circumstances would consider the work environment to be abusive or hostile.

78. As a direct and proximate result of BMPC's actions and/or failures to act, Farish has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities, including loss of overtime pay. Farish is thereby entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him.

79. BMPC's conduct was malicious and oppressive, and done with reckless disregard for Farish's federally protected rights, for which Farish is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## COUNT FOUR
## VIOLATION OF THE IDAHO HUMAN RIGHTS ACT
### (Hostile Work Environment)

80. Farish realleges and incorporates by reference paragraphs, through 1 through 79 as though fully set forth herein.

81. BMPC violated the Idaho Human Rights Act, Idaho Code § 67-5901, *et seq*., by subjecting Farish to a hostile work environment.

82. As direct and a proximate result of BMPC's actions and/or failure to act, Farish has suffered and will continue to suffer a loss of earning and other employment benefits and job

opportunities, including loss of overtime pay. Farish is therefore entitled to general and compensatory damages, such amount to be proven at trial, as well as any other equitable remedies available to him.

83. BMPC's conduct was malicious and oppressive, and done with reckless disregard for Farish's rights, for which Farish is entitled to punitive damages pursuant to Idaho Code § 67-5908.

## COUNT FIVE
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
### (Retaliation)

84. Farish realleges and incorporates by reference paragraphs 1 through 83 as though fully set forth herein.

85. Farish engaged in an activity protected by federal law by reporting sexual harassment and a hostile work environment to BMPC.

86. BMPC subjected Farish to adverse employment actions by placing Farish on paid administrative leave, forcing Farish to undergo numerous psychological assessments, denying Farish job training and opportunities, disciplining Farish, and requiring Farish to pay for unnecessary treatment himself.

87. Farish's reporting of sexual harassment and a hostile work environment to BMPC was a motivating factor in BMPC's decision to take adverse actions against Farish.

88. As a direct and proximate result of BMPC's actions and/or failures to act, Farish has suffered and will continue to suffer loss of earnings and other employment benefits and job-related opportunities, including loss of overtime pay. As a further direct and proximate result of BMPC's actions and/or failures to act, Farish has suffered and will continue to suffer emotional distress, consisting of shock, outrage, and humiliation, reasonably occurring and

likely to occur based on the retaliation he experienced. Farish is entitled to general and compensatory damages in an amount to be proven at trial.

89. BMPC's conduct was malicious and oppressive, and done with a reckless disregard for Farish's rights, for which Farish is entitled to punitive damages pursuant to 42 U.S.C. § 1981(a).

## COUNT SIX
## VIOLATION OF THE IDAHO HUMAN RIGHTS ACT
### (Retaliation)

90. Farish realleges and incorporates by reference paragraphs 1 through 89 as though fully set forth herein.

91. Farish engaged in an activity protected by Idaho law by reporting sexual harassment and a hostile work environment to BMPC.

92. BMPC subjected Farish to adverse employment actions by placing Farish on paid administrative leave, forcing Farish to undergo numerous psychological assessments, denying Farish job training and opportunities, disciplining Farish, and requiring Farish to pay for unnecessary treatment himself.

93. Farish's reporting of sexual harassment and a hostile work environment was a motivating factor in BMPC's decision to take adverse employment action against Farish.

94. As a direct and proximate result of BMPC's actions and/or failures to act, Farish has suffered and will continue to suffer loss of earnings and other employment benefits and job-related opportunities, including loss of overtime pay. As a further direct and proximate result of BMPC's actions and/or failures to act, Farish has suffered and will continue to suffer emotional distress, consisting of shock, outrage, and humiliation, reasonably occurring and likely to occur based on the retaliation he experienced. Farish is entitled to general and compensatory damages in an amount to be proven at trial.

## ATTORNEYS' FEES

95. As a further direct and proximate result of BMPC's actions and/or failures to act, Farish has been compelled to retain the services of counsel, and has thereby incurred and will continue to incur costs and attorneys' fees which should be required to be paid by BMPC pursuant to Idaho Code §§ 12-120 and 12-121; 42 U.S.C. § 12205; and 42 U.S.C. § 2000e-5(k).

## DEMAND FOR JURY TRIAL

Farish demands trial by jury as to all issues triable to a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Farish seeks judgment against BMPC as follows:

1. For compensatory and general damages as well as statutorily available damages in an amount as shall be proven at trial, and any available equitable remedies;

2. For punitive damages;

3. For prejudgment interest on all amounts claimed;

4. For attorneys' fees pursuant to statute and costs of suit; and

5. For such other and further relief as the Court deems just and proper.

Dated this 22nd day of June, 2016.

/s/
Amanda E. Ulrich
HOLDEN, KIDWELL, HAHN & CRAPO, P.L.L.C.

G:\WPDATA\AEU\18265 Farish\Pleadings\Complaint.wpd